IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

DEBRA BROWN, JEROME BELL,           )
CHARLES BROOKS, MICHAEL McGUINN,    )
AND JASON SWEARINGTON,              )
                                    )
          Plaintiffs.               )
vs.                                 )  No. 4:05-CV-67
                                    )
COFFEE COUNTY, TENNESSEE; STEVE     )
GRAVES, Individually and in his     )
official capacity; PAMELA FREEMAN,  )
Individually; OFFICER TREY,         )
Individually; BRITNEY HODGES,       )
Individually; TERESA HULAN,         )
Individually, SGT. GENTRY,          )
Individually; KEITH SHELLER,        )
Individually, LT. CHARLES BEATTY,   )
Individually; KAYRON BOWEN,         )
Individually; JONATHAN YOTT,        )
Individually; WADE FERRELL,         )
Individually; and JOHN DOE 1-5,     )
                                    )
          Defendants.               )

--------------------------------------------------------



Deposition of:

**JOHN HANNA, JR.**

Taken on Behalf of the Plaintiffs

January 17, 200



--------------------------------------------------------
*Bain, Cleeton & Evans*
*An Association of Court Reporters*
*212 Third Avenue North • Suite 201*
*Nashville, Tennessee  37201*
*Phone: (615)255-6425*

*Reported By: LaVonne Cleeton, RMR, CRR*

1    of problems.

2            Like I say, when I train -- I just came

3    out of a training class and we talked about that.

4    And we talk about that in -- I train throughout the

5    year.  Just about every week I've got two or three

6    classes, basic and in-service, and we talk about

7    that.

8        Q.    Do you do any training for correctional

9    officers in recognizing emergency medical

10   conditions?

11       A.    We talk about the AMA stipulations that

12   say that certain types should not be let into a

13   jail, but that's administrative.  We don't get into

14   administrative policies, but -- and then every jail

15   is supposed to have -- supposed to have medical

16   protocol assigned from a doctor to a nurse to the

17   jail to offset any emergency situation.

18       Q.    So there's no specific classes that TCI

19   gives to corrections officers in Tennessee about

20   recognizing emergency medical conditions?

21       A.    No, we don't.

22       Q.    Was there a time that the Coffee County

23   Jail was decertified?

24       A.    They were decertified last year.  I

25   forget exactly when.

Case 4:05-cv-00067   Document 67-2   Filed 01/23/08   Page 2 of 26   PageID #: 157

```
 1    that county that got the pursestrings that they're
 2    holding onto them need to say we're going to do
 3    something about it.  We're going to get a
 4    feasibility study and then we're going to take it
 5    forward from point A to point B to point C,
 6    whatever.  That's the plan that -- No. 2.
 7              And then we say let's -- I'll tell you
 8    what we're going to do.  And it's not me doing it.
 9    It's the Board of Control.  We're going to give them
10    time to bring this forth, and then we follow it up.
11         Q.    And then your other X was
12    "overcrowded/county/state prisoners" and it says
13    "attach ADA calculations."
14         A.    And that's what I was speaking of
15    earlier when I said ADA.  Average daily attendance.
16    We take three months and we find out how many
17    Department of Corrections and how many -- and then
18    we subtract that.  That's what I was speaking of
19    earlier.
20         Q.    And let me tell you what puzzles me.
21    I've read your regulations and they -- TCI
22    regulations and they require so many showers per
23    inmate.
24         A.    Right.
25         Q.    So many toilets per inmate.
```

```
 1          A.    Right.

 2          Q.    So many square footage of --

 3          A.    Right.

 4          Q.    -- space for each inmate.

 5          A.    Right.

 6          Q.    And these are minimum standards,

 7   correct?

 8          A.    Right.  Right.

 9          Q.    But if they have a lot of state

10   prisoners that the State is not taking, they don't

11   necessarily have to meet those standards?

12          A.    Well, they have to meet them, but,

13   still, you have the bodies there that compromise

14   square footage.  See, that's what we do.  So we

15   just -- we still -- we can't count those as -- into

16   the general count, you see?

17          Q.    It wouldn't be fair to do that --

18          A.    Can't do that.

19          Q.    -- if the State is not -- you're

20   inspecting and making these rules, but at the same

21   time the State Department of Corrections is not

22   taking the state prisoners fast enough?

23          A.    Right.  You see, it can't be held -- we

24   don't hold the jail accountable for the state

25   inmates.  So we have to go on -- and it's just the
```

1  law.  I've got it, but I don't have it -- I've got
2  it in my office.  It says that these items should be
3  deducted from the overcrowding.  That's where the
4  ADA comes in.
5       Q.    But from the inmate standpoint, if the
6  minimum standards are the minimum required for
7  constitutional or decent housing --
8       A.    Right.
9       Q.    -- the inmate isn't getting that?
10      A.    Right.  If that's the case, right.  And
11 then, you know, that's the reason they say I'm going
12 to sue.  Then we talk about inmates' rights.  Well,
13 that's constitutionally correct.  They've got
14 institutional privileges, but they've got
15 constitutional rights and you can't violate -- if
16 you violate it, of course, you can be cited for some
17 tort.
18      Q.    As a matter of fact, the Tennessee
19 Constitution requires that inmates be treated
20 humanely, doesn't it?
21      A.    Oh, yes.  Yes.  And then we start
22 talking about -- what comes up is duty of care and
23 it's the jails's responsibility to provide for the
24 basic needs of inmates.  And we're not talking about
25 something that's cosmetic, cosmetically appealing,

1  but we start talking about basic needs.

2         And then if it's -- that can't be a

3  violation if that's done.  But if you neglect on

4  that, then you can be cited for a certain type of

5  negligence.  It can be gross negligence, simple

6  negligence, whatever.

7         Jails know this.  They know it, but if

8  they don't do it -- just like some of my jails, they

9  don't do what they're supposed to.  They know, but

10 they just won't do it for whatever reason.  I don't

11 know.

12       Q.    Did Coffee County submit a plan based

13 on the overcrowding of county prisoners?

14       A.    I think they submitted a form that said

15 that they're going to do this and they're going to

16 do that, and we followed it up, but like I say, I

17 don't have all those records at my disposal because

18 I didn't know this was going to come up.  We were

19 going to try and wait and see what they were going

20 to do about, you know, the jail itself.

21       And when I go back -- you see, I'm

22 going back and inspect this year and see what

23 they're doing.  They had the stipulation for the

24 shower.  Put it like that.  They didn't have enough

25 shower heads to oversee the shower problem in the

1   jail, and so they were putting in extra showers.
2           Okay.  That's fine.  But they haven't
3   given me a notification that this has been
4   completed, has been done.  They say they was working
5   on it.  So I'm in the process of going back
6   probably -- I can't next week because I've got a
7   class, but the following week I'm going to sneak
8   over there and just see if that's been done.
9           But then I have to look at some other
10  things because I probably will do an inspection, you
11  see.  It's not really -- you see, we put down the
12  times that we inspect and we try to offset it each
13  year, but I might just change that around because
14  I'm not too sure about Coffee County.  They need to
15  go ahead on and get that taken care of or they're
16  going to have some other problems in this area.
17          Q.    How long have they been promising to
18  add shower heads?
19          A.    Okay.  Now, this was last year.  The
20  last time I stopped by there -- actually, it's about
21  August, September I think I stopped by there and
22  they were in the process.
23          Q.    Of 2006?
24          A.    Right.  If I'm not mistaken, that's
25  supposed to have been done by now, but I would like

1   to see it so I'll probably stop by.

2       Q.     When you do your inspections of local

3   jails, do you notify the jails that you're going to

4   do the inspection?

5       A.     No.  Unannounced.  No.  We don't do

6   that.  The only announced visit is the reinspection,

7   and then we go to look at specific things and then

8   we just look at the overall picture.  But specific

9   things that were in noncompliance from the previous

10  initial inspection, that's the only one that we

11  announce.  Initial inspection, unannounced.

12      Q.     On your, I guess, next-to-last page

13  under "Classification" you've got a note about

14  unable to -- unless I've got them out of order

15  there.  You've got a note:  Unable to classify due

16  to the overcrowding of inmates.

17      A.     Right.  Wherever it is.  Okay.  Right.

18      Q.     And you say:  Recommend inmate/officer

19  life safety issues take priority when attempting to

20  classify inmates.

21      A.     Right.  Okay.  When you start talking

22  about gender, age, prior record and all those

23  things, that's -- but when you're overcrowded it's

24  very hard to do that because sometimes you have

25  someone that's got a major felony classified with

Reporter: LaVonne Cleeton, RMR, CRR
Phone: (615) 255-6425

1    someone that's got something for less a degree.

2             So, then again, you know, like I said,

3    overcrowding causes other problems.  This is one of

4    them.  Classification system.  It goes out wide.

5         Q.    And that's one of the minimum standards

6    published by the TCI, is classification of -- what

7    is it?  Low, medium, and high-security inmates?

8         A.    Right.  That it should not be

9    compromised.

10        Q.    And when you did your inspection here

11   in September of 2004, it was compromised, right?

12        A.    Well, anytime you're overcrowded, it

13   seems like to me, you know, when I look through the

14   records, I see an inmate over here that's got a

15   major crime and he's housed with, you know -- it's

16   not against the law to house felons with

17   preadjudicated or whatever, but it's not a good

18   idea.  It's not recommended.

19            So when you're overcrowded, it happens.

20   I mean, you don't have any choice because you don't

21   have anywhere to put them.  And when you start

22   talking about a special needs cell, you talk about

23   medical, you talk about mental health, the jail's

24   not equipped to handle mental health types.

25            So then you have to do the best you

1    can, but then you find out who's got the life

2    security issues and then try your level best in that

3    regard to weed them out from the general population.

4         Q.    The way that the Coffee County Jail has

5    been built, is there any way to separate out

6    prisoners with mental health issues?

7         A.    Not -- they don't have the space, they

8    don't have the room, and that's the problem.

9         Q.    And the same thing with violent

10   inmates?

11        A.    Right.  When we start talking about

12   maximum security, that needs -- we've got inmates,

13   the 13 gangs that they found a few 13 here not too

14   long ago, and they're infiltrating a lot of the

15   jails and people don't realize it, the officials

16   don't realize it because they're not really visible.

17   They're low-profile.

18             But all of a sudden when they start

19   acting up, then they act like STG.  When we start

20   talking about STG, security threat groups that come

21   to the jail.  Okay.  Those individuals need to be

22   weeded out and really classified because they can

23   cause some problems, big problems in the jail.

24        Q.    Now, in your summary of comments down

25   at the bottom, you say:  Coffee County has outgrown

1    this facility.

2         A.    Yes.

3         Q.    You say:  The condition of this jail

4    has vastly deteriorated since the 2003 inspection,

5    due in part to the influx of inmates.

6         A.    Right.  You see -- go ahead.

7         Q.    And the jail staff is sure to see more

8    incidents of assault, escape attempts, riots, and

9    attempted inmate suicides.  Correct?

10        A.    Right.

11        Q.    And you strongly recommended hiring

12   additional jail staff and/or reducing the inmate

13   population?

14        A.    Right.

15        Q.    And did Coffee County hire additional

16   jail staff or reduce the inmate population?

17        A.    I don't -- they reduced the inmate

18   population, according to Pam Freeman, but hiring

19   additional staff is always a problem and I don't --

20   they might have lost a few.  If you lose and then

21   hire, that's not hiring additional.  You're right

22   back where you started.

23        Q.    And is that a problem because of the

24   cost of hiring additional staff?

25        A.    It's been known to happen.  My last

Case 4:05-cv-00067   Document 67-2   Filed 01/23/08   Page 11 of 26   PageID #: 166

1  class, this nurse came in.  She had worked at River

2  Bend and she would -- they told me that she was not

3  available for comment the next day.  She quit the

4  job because the money wasn't up to her expectation.

5  So a lot of times it's money.  You know, they've got

6  families.

7           MR. BAUM:  Mark that.

8           (Whereupon, the previously mentioned

9  document was marked Exhibit No. 2.)

10          Q.    (BY MR. BAUM)  Mr. Hanna, I'm going to

11  hand to you what's been marked for purposes of

12  identification as Exhibit No. 2.  It starts with a

13  November 29th, 2004 letter from Mr. Abston to

14  Sheriff Steve Graves.

15          A.    Uh-huh.

16          Q.    This is where TCI notified Sheriff

17  Graves that the Coffee County Jail did not meet the

18  applicable minimum standards.  In this one it says

19  that you had recommended certification pending the

20  Board of Control's review.

21          A.    Right.  Talking about I recommended.

22  Of course, now, they do what they do.  But I

23  recommended it because they were really trying.

24  They were trying.  And we talked about overcrowding,

25  which you can see it's not as many.  They knocked it

1   down. And, you know, of course, they had 30 state.

2   Then, of course, everything has been knocked down

3   and they did try to, you know, relieve overcrowding.

4           But like I said before, this hiring of

5   extra staff, additional staff, I don't think

6   happened. But they don't let us know when they hire

7   new staff.

8       Q.   While I'm looking back at Exhibit

9   No. 1, and it looks like between the first

10  inspection in September and this reinspection, that

11  the full-time staff stayed the same?

12      A.   Right. But the population went down.

13      Q.   Okay. But I see that, looking near the

14  bottom of Page 3, it says: Are you presently

15  renovating, constructing, or planning a new

16  detention facility? And that's been changed to

17  "yes."

18      A.   Right. So that's one of the things

19  that they were looking into, but like I said, I

20  haven't had -- I told them to give me a progress

21  report and I don't know to what extent they've

22  followed through.

23      Q.   Do you know, did Coffee County ever

24  secure any funding for a new facility?

25      A.   Right. See, that would be in the

1   process, and I'm not aware of that.

2       Q.   Are you aware of whether or not Coffee

3   County has ever engaged the services of an architect

4   to design a new jail?

5       A.   I don't know.  See, that would be part

6   of the process.

7       Q.   You've got a note here on this same

8   page.  I'm looking it's handwritten.  "Corrections

9   attached."  The population the day of inspection has

10  been crossed out.

11      A.   Right.  This looks like Peggy Sawyer.

12  Evidently it started out with -- this is the wrong

13  figure.  The right figure is what's been crossed

14  out.  And it got to 191.  It was 132.

15      Q.   So the actual population was 191 on the

16  day of the inspection?

17      A.   I believe so.  It was less than 263.

18  That's still past 132.  Way past 132.  60.  And I

19  talked to Pam and she said, "We just don't have

20  anywhere to put them."

21      Q.   On the next page down you've got some

22  notes.  The facility is overcrowded?

23      A.   Right.

24      Q.   Does not meet square footage or

25  toilet/shower requirements.

Reporter: LaVonne Cleeton, RMR, CRR
Phone: (615) 255-6425

1      A.     Right.   This is the shower nibs that I

2   spoke of earlier.

3      Q.     And down below farther you note that

4   there's not enough staff to properly supervise the

5   inmates?

6      A.     Right.

7      Q.     And on the next-to-last page you've got

8   some notes.   You note that inmates are being very

9   destructive.

10     A.     Uh-huh.   Right.

11     Q.     And you say, basically, it's the

12  current staff's inability to supervise the increased

13  population?

14     A.     Right.

15     Q.     What type of thing did you see that

16  made you -- that told you they were being

17  destructive?

18     A.     Breaking off parts of showers.   Tearing

19  up tile.   Doing things that -- it's interior.   And

20  it's talking about conditions of confinement.   The

21  conditions wasn't suitable for their reasonable

22  habitat, so they get frustrated and they start being

23  destructive, just tearing up government property.

24          In some cases flood -- okay.   Attempted

25  to start fires in some of my jails.   I'm not sure

1  about this one.  But some of the cases in the past
2  have been stopping up toilets, flooding jail cell
3  areas.  So all that's being destructive.  They don't
4  have to just tear something up, but they can cause
5  something to malfunction.  And this is a 22-year-old
6  jail.
7      Q.    Yeah.  In your summary you note that
8  Coffee County has outgrown this 22-year-old jail.
9      A.    Uh-huh.
10     Q.    And under "Classification" you put:  No
11  space available to female inmates are being housed
12  in unauthorized --
13     A.    Nonsecure area.  I don't remember
14  exactly where, but -- this is evidently true.  But,
15  you see, when they're put -- they're supposed to
16  have sight and sound separation.  Okay.  That's
17  No. 1.  No sight, no sounds between male inmates.
18         But in older jails they might have
19  sight separation but they don't have sound
20  separation.  Well, it's no real big thing.  But when
21  you start talking about putting them where that they
22  can move -- when they move from one area to the
23  other and they can almost reach out and touch
24  someone, that's not -- that's a biggie.
25             And so the reason why I put that -- I

1   don't know exactly where it was. I'd have to, you

2   know, go back to the jail now because all these

3   different jails it's confusing trying to remember.

4   But if I say it's so, it's so. You know, it's

5   nonsecured and due to overcrowding they have to put

6   them somewhere.

7         But there's still supposed to be one

8   female on each shift to properly supervise the

9   safety of the female inmates. You see? Now, I

10   think that's happening, but they're still -- they

11   should be set somewhere else in the facility, which

12   is not possible, away from males.

13       Q. Let me ask you. Exhibit No. 1 and

14   No. 2, the reports, those are reports that you

15   prepared in the course of your duties?

16       A. Right.

17       Q. And these are true and accurate copies

18   that you produced pursuant to a subpoena?

19       A. Right.

20       Q. Mr. Hanna, I'm going to hand to you

21   what's been marked for purposes of identification as

22   Exhibit No. 3.

23       (Whereupon, the previously mentioned

24   document was marked Exhibit No. 3.)

25       Q. (BY MR. BAUM) The front cover is an

1  October 27th, 2005 letter from Mr. Abston to Sheriff

2  Graves.  And then that second page, it looks like

3  you did an inspection of the Coffee County Jail on

4  October 25th, 2005?

5         A.    Uh-huh.

6         Q.    And this is one of the things I noticed

7  where the capacity of the beds was different than

8  what you had seen.

9         A.    I think they were using a drunk tank,

10 and you can't use a drunk tank for jail capacity so

11 I took care of that.

12        Q.    And on the date of this inspection --

13 I'm looking at the fourth page down -- the capacity

14 at the Coffee County Jail was for 131 beds?

15        A.    Right.

16        Q.    And the population on the day of

17 inspection was 155?

18        A.    Right.

19        Q.    And it looks like the staff had

20 increased at this time?

21        A.    Okay.  From how many?

22        Q.    Well, from the previous reports it

23 looks like there was 16 and now we've got 20.

24        A.    20.

25        Q.    I'm not sure what that "X" over by

1    "part-time" means.

2         A.    No part-time.

3         Q.    Okay.

4         A.    Okay.  I see that they hired three.

5    Three new hires.

6         Q.    Down near the bottom you've got a note

7    about money being approved to renovate the doors and

8    locks?

9         A.    Right.  Cornerstone was the provider.

10        Q.    Looking at the last page under your

11   summary, you note the medical receipt system was

12   established and the medical protocol was assigned to

13   the nurse.

14        A.    Right.

15        Q.    What does that mean?

16        A.    Well, medical -- when we go into the

17   medical section of a jail, we try to establish how

18   the medication is being passed out to the inmates.

19   Okay.  Officers are not allowed to make up

20   medications.  They're only allowed to give it out.

21   But some jails it doesn't work like that.  So if it

22   doesn't, then that means that is prepackaged over

23   here from the nurse and the doctor and then it's

24   given out to them.  That's good.

25               And then, also, if they've got a

1 doctor's medical protocol assigned to the nurse,

2 like I mentioned earlier, then that's good.  They

3 didn't have it per se the previous inspection, but

4 they did this time.

5         So all those things -- they tried to

6 straighten up their act, so to speak.  And that's

7 the reason why -- you know, they repaired the locks.

8 But, see, the ADP calculation, official census,

9 which reduced the count, so I didn't see any other

10 reason to present to the board and the board say,

11 okay, let's go ahead on and certify it.  But, now,

12 square footage is still being compromised because

13 they've still been overcrowded with state inmates.

14     Q.    You say the medical protocol.

15     A.    Right.

16     Q.    Prior to this inspection there had not

17 been a medical protocol?

18     A.    They had one, but it was just a

19 haphazard thing that they were using.  Now, I said

20 you need one issued from a doctor assigned to the

21 jail.

22     Q.    And as part of that medical protocol

23 there would be emergency --

24     A.    Processes for emergencies that arise in

25 the jail throughout the inmate population.

Case 4:05-cv-00067   Document 67-2   Filed 01/23/08   Page 20 of 26   PageID #: 175

1     Q.    And do you recall, prior to this

2  inspection, did they have such an emergency

3  procedure?

4     A.    Yeah.  They had one.  I don't know how

5  effective it was, but they had one.  I can't tell

6  you -- I can't go into that.  But when we start

7  talking about 14-day physicals that are supposed to

8  be done and then a person's got -- you can get into

9  a deliberate indifference if you're not careful, if

10  you deny them of their acute medical needs.  Of

11  course, indifference, you know, goes a lot of

12  different ways, but that could be a biggie.

13     Q.    And, again, this report on Exhibit

14  No. 3 is one that you prepared in the ordinary

15  course and scope of your employment?

16     A.    Right.

17     Q.    And this is a true and accurate copy?

18     A.    (Witness moves head up and down.)

19     Q.    Mr. Hanna, I'm going to hand to you

20  what's been marked for purposes of identification as

21  Exhibit No. 4.

22          (Whereupon, the previously mentioned

23  document was marked Exhibit No. 4.)

24     Q.    (BY MR. BAUM)  It begins with a letter

25  from Mr. Abston, June 12th, 2006.  Does this appear

1   to be an Inspection Report that you prepared

2   June 5th of 2006?

3        A.    It seems like, yes.

4        Q.    Looking at the third page down, you got

5   it marked that it was overcrowded with county

6   prisoners and a plan was required?

7        A.    Oh, okay.  Right.  Plan required.

8   Right.

9        Q.    And down a little bit you've made a

10   note:  There needs to be one operable shower per

11   every 16 inmates.

12        A.    This is the shower that we were talking

13   about.  It seemed like they -- it wasn't there.

14        Q.    And looking at the last page, when you

15   inspected the Coffee County Jail on June 5th, 2006,

16   the number of beds was still 131?

17        A.    Right.

18        Q.    And the population on the day of

19   inspection was 234?

20        A.    Right.

21        Q.    And the average daily population had

22   been 183.2?

23        A.    Right.  State inmates were 41,

24   subtracted from 234.  Yes.  The ADP that we speak

25   of.

1    but at the workhouse I administered to the needs of

2    the inmates and family, friends, loved ones.  Took

3    care of their needs, family.  I did that for a

4    couple of years.  Then I came to the Criminal

5    Justice Center and worked 16 years.

6          Q.    What did you do at the federal level?

7          A.    In the federal?  Took care of federal

8    inmates at Opportunity House over on 100 Oaks Drive

9    for two years.

10         Q.    I think I'm just about done.  Let me

11   just take a fast look here.

12               MR. BEEMER:  Do you want to take a

13   break while you look at your notes?

14               MR. BAUM:  I just want to run through

15   this one document.  Yeah.  We might as well take

16   five minutes.

17               (Whereupon, a recess was taken from

18   11:27 a.m. until 11:34 a.m.)

19         Q.    (BY MR. BAUM)  Just a few questions.

20   On Exhibit No. 8, looking at the second paragraph of

21   the November 8th, 2004 letter to Sheriff Graves.

22         A.    Uh-huh.

23         Q.    Down at the bottom of that paragraph

24   you told them that there was possible litigation if

25   family members claim an inmate received inadequate

1  medical or mental health care?

2       A.    Yeah.  That's possible.  And then, of

3  course, like I say, anytime I put something of this

4  nature out, the possibility is always there.  It's

5  according to like how you feel and what are you

6  going to do about it.  If you know something and

7  don't do anything about it, you're right back where

8  you started.  So if you know it's going to happen

9  and they've been told, then why do you stand back

10  and let things happen.  That's what this was all

11  about.

12       Q.    Are you familiar with any of the county

13  commissioners in Coffee County, Tennessee?

14       A.    Ray Johnson.  I know him.  We talk back

15  and forth from time to time.

16       Q.    Why I was asking, I've heard that one

17  of the county commissioners has made the comment

18  that if he had his way, inmates would not receive

19  any medical care unless they paid for it themselves.

20       A.    I haven't heard that.  Now, in Wilson

21  County Sheriff Ash, Terry Ash, we go way back.  I

22  was called to ask to what extent do we charge for

23  medical care.  I said, well, it's your duty to

24  provide for basic needs up to a point.  Then when it

25  gets to be exploratory or anything else, you need to

```
 1    it's on No. 10, the -- I guess 9.  That's the annex.
 2    This is the jail.  It's No. 10.  I believe that's
 3    the August 13th of 2003 inspection of the Coffee
 4    County Jail.
 5         A.    Uh-huh.
 6         Q.    I'm looking at your Annual Jail Data
 7    Profile.
 8         A.    Okay.
 9         Q.    And over to the right, a quarter of the
10    page down you've got type and number of inmates.
11    Correct?  In the shaded area.
12         A.    Right.
13         Q.    And typically when you add these up,
14    the numbers will add up to the population on the day
15    of inspection, correct?
16         A.    Right.
17         Q.    And if I add 90 locals to 82 pretrial,
18    I come up with 172, correct?
19         A.    (Witness moves head up and down.)
20         Q.    And it's showing the population the day
21    of inspection as 127.
22         A.    I don't know -- I don't think this is
23    accurate as far as these numbers are concerned.
24         Q.    How do you know the 127 was accurate?
25         A.    That's what I'm saying.  I don't think
```

1   this is accurate.  Whatever the figures over here,
2   it should be over here.
3           Q.    Now, this document, if you turn to the
4   next page, the information for this inspection was
5   provided by Sergeant Beaty, correct?
6           A.    Right.
7           Q.    And typically you're dealing with
8   Lieutenant Freeman?
9           A.    Yeah.  I know.  Right.  Captain now.
10  But at this time I think she was on vacation or
11  whatever, and if I'm not mistaken, he gave me the
12  figures.  And that's where the problem is, because
13  he's just the maintenance man.  Do you know Charles
14  Beaty?  Yeah.  Do you know Charles Beaty?  So that
15  could be the case, but I have to go by what they
16  give me.
17          Q.    And they've got down there on that
18  Annual Jail Data Profile, he's got seven new hires
19  since last inspection?
20          A.    Okay.  Not exactly accurate.
21          Q.    So there could be some inaccuracies on
22  this document?
23          A.    Right.  On this one.  But it probably
24  got straightened up on the next one.
25              MR. BAUM:  Okay.  I don't have anything